DAVID J. VANHAVERMAAT, Cal. Bar No. 175761
Email: vanhavermaatd@sec.gov
FINOLA H. MANVELIAN, Cal. Bar No. 180681
E-mail: manvelianf@sec.gov
MARSHALL S. SPRUNG, Cal. Bar No. 188253
E-mail: sprungm@sec.gov
LESLIE A. HAKALA, Cal. Bar No. 199414
E-mail: hakalal@sec.gov
CATHERINE W. BRILLIANT, Cal. Bar No. 229992
E-mail: brilliantc@sec.gov

Attorneys for Applicant
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Andrew G. Petillon, Associate Regional Director
John M. McCoy III, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

FILED
CLERK, U.S. DISTRICT COURT
SEP 25 2009
10:40
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

CV09-6980 SVW (RCx)

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION TO ENFORCE ADMINISTRATIVE SUBPOENAS OF THE<br><br>SECURITIES AND EXCHANGE COMMISSION,<br><br>Applicant,<br><br>v.<br><br>ELLIOTT BROIDY,<br><br>Respondent. | Case No.<br><br>**DECLARATION OF LESLIE A. HAKALA IN SUPPORT OF THE SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE* APPLICATION FOR AN ORDER TO SHOW CAUSE AND APPLICATION FOR AN ORDER COMPELLING COMPLIANCE WITH ADMINISTRATIVE SUBPOENAS** |

I, Leslie A. Hakala, declare pursuant to 28 U.S.C. § 1746 as follows:

1. This declaration is submitted in support of the Securities and Exchange Commission's *Ex Parte* Application for an Order to Show Cause and Application for an Order Compelling Compliance with Administrative Subpoenas issued to Elliott Broidy ("Broidy"). Unless specifically stated, I have personal knowledge of the matters set forth below.

2. I am a staff attorney in the Los Angeles Regional Office of the Securities and Exchange Commission ("Commission"). In the course of my duties with the Commission, I conduct investigations into possible violations of the federal securities laws. My responsibilities include, among other things: (1) subpoenaing documents and witnesses; (2) obtaining and analyzing documents; (3) taking testimony; and (4) determining whether there have been violations of the statutes enforced by and regulations promulgated by the Commission.

### The California Public Pension Funds Investigation

3. I am one of the attorneys assigned to the Commission's formal investigation entitled *In the Matter of California Public Pension Funds*, Commission File No. LA-3644. Along with other staff members, I am conducting this investigation out of the Commission's Los Angeles Regional Office, located in Los Angeles, California. I am familiar with the investigatory file in this matter, including each of the orders issued by the Commission in this matter as well as each of the subpoenas issued by the Commission's staff in this matter.

4. The Commission issued a formal order of private investigation ("Formal Order") in this matter on May 27, 2009. The Formal Order designates certain members of the Commission's staff, including me, as officers of the Commission. Designated officers of the Commission are empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence and require the production of any books, papers, correspondence, memoranda, contracts, agreements, or other records deemed relevant or material to the inquiry,

and to perform all other duties in connection therewith as prescribed by law. A true and correct copy of the Formal Order is attached to this declaration as Exhibit A.

5. Pursuant to the Formal Order, the Commission's staff is seeking information regarding, among other things, possible violations of the antifraud provisions of the federal securities laws arising out of the investment of money by public pension funds in California ("California Public Pension Funds") with investment management firms and others.

6. According to voluminous documents which are publicly available on the website of the Los Angeles Fire and Police Pension System ("LAFPP") and conversations I have had with Broidy's counsel, Broidy served as a mayoral appointee to the Board of Fire and Police Pension Commissioners of the City of Los Angeles ("LAFPP Board") from at least 2002 until his resignation on May 7, 2009. LAFPP's website is located at www.lafpp.com.

7. According to the biography he produced to the Commission's staff, Broidy also "is the Founder and Chairman of Markstone Capital Partners, a $800 million private equity fund dedicated to investing in traditional industries within the Israeli economy." A true and correct copy of that biography is attached as Exhibit 1. (I believe that Broidy may be the chairman of Markstone Capital Group, which acts as the investment manager for Markstone Capital Partners, the private equity fund (collectively, "Markstone"). ). I have received documents from Broidy indicating that the California Public Employees' Retirement System ("CalPERS") agreed to invest a total of $50 million in Markstone in two separate investments in October 2003 and September 2005. In the second transaction, Markstone used a placement agent. That placement agent's counsel has told me that (1) did not apply to become a registered broker-dealer until November 2005 and (2) did not actually register until October 2006. In addition to CalPERS, it appears that Markstone obtained investment commitments from more than nine

other public pension funds in five other states (New Mexico, New York, North Carolina, Oregon, and Texas). According to his biography, Broidy also runs an entity called Broidy Capital Group, his private investment company.

8. I have reviewed evidence in this investigation which indicates that Broidy lives in Los Angeles, California, and that Markstone's offices are in Century City, California.

### The April 7, 2009 Voluntary Document Request to Broidy

9. On April 7, 2009, I sent Broidy a request that he voluntarily provide seven categories of documents and information by April 21, 2009 ("April 2009 Request"). A true and correct copy of the letter I sent to Broidy on April 7, 2009 is attached as Exhibit 2. On or about April 14, 2009, Alexander H. Southwell ("Southwell") of Gibson Dunn & Crutcher LLP ("Gibson Dunn") contacted me on Broidy's behalf to request that the deadline for the voluntary production be extended to May 5, 2009, and I agreed. I understand that Broidy Capital Management has consulted with both Gibson Dunn, a nationwide law firm, and Southwell in particular regarding allegations of improprieties related to public pension funds for at least a year. On or about May 1, 2009, Broidy provided the Commission with copies of his publicly filed Statement of Economic Interests and similar financial disclosure forms. Shortly thereafter, Southwell told me that Broidy preferred not to voluntarily produce the other six categories of documents described in the April 2009 Request. Broidy subsequently produced a memo that another of his lawyers had apparently written in May 2009 to defend Broidy's recusal notification decisions.

### The May 28, 2009 Document Subpoena to Broidy

10. On May 28, 2009, after the Formal Order was issued, I sent Broidy an investigative subpoena requiring him to produce the same documents that I had previously requested he voluntarily provide ("May 2009 Subpoena"). A true and correct copy of the May 2009 Subpoena is attached as Exhibit 3. Broidy was

3

required to produce these documents by June 12, 2009. I served the May 2009 Subpoena on Southwell, who had previously confirmed to me that he was authorized to accept service for Broidy, via Federal Express, and I obtained a delivery confirmation.

11. On or about June 8, 2009, Broidy produced less than 200 pages of documents responsive to the subpoena, including what appear to be several telephone messages from a placement agent regarding private equity investments and public pension fund matters. Other than that, Broidy did not comply with the deadline in the May 2009 Subpoena.

12. On June 10, 2009, at Southwell's request, the Commission's staff (Andrew Petillon, Finola Manvelian, Marshall Sprung, and I) met with Broidy's counsel to discuss, among other things, the subpoenas to Broidy. Southwell and Douglas M. Fuchs (also of Gibson Dunn), and Bradley H. Mindlin (another attorney for Broidy) attended this meeting. My colleagues and I told counsel that Broidy could voluntarily produce his bank and brokerage account records himself if he chose to do so (even though those account records were not specifically called for by the subpoena). I expressly told counsel, however, that the Commission's staff would not promise not to subpoena documents from Broidy's financial institutions if we decided that was appropriate.

### The June 15, 2009 Document Subpoena to Broidy

13. On June 15, 2009, I sent Broidy another subpoena for documents, including the same records I had previously requested as well as additional documents ("June 2009 Subpoena"). Documents responsive to this subpoena were due on June 27, 2009. I served the June 2009 Subpoena on Southwell via Federal Express, and I obtained a delivery confirmation. Broidy did not produce any records in response to the June 2009 Subpoena by the June 27, 2009 deadline. A true and correct copy of the June 2009 Subpoena is attached as Exhibit 5.

14. About June 22, 2009, Southwell and I spoke by telephone. Southwell said that Broidy expected to produce documents by June 29, 2009. Southwell indicated that the production of documents had been delayed by Broidy's busy schedule of business meetings, a family celebration, and a summer vacation.

15. On June 29, 2009, Southwell sent me an email saying, "Sorry I haven't been able to send out a production as I had been hoping to but we ran into some production issues. We're are working on getting you material as soon as possible." A true and correct copy of that email is attached as Exhibit 6.

16. On July 1, 2009, I sent Southwell a letter reviewing this sequence of events and noting that the deadline by which Broidy was required to produce documents pursuant to the June 2009 Subpoena had passed without him producing anything. I explained in that letter that Broidy was legally obligated to comply with the May and the June 2009 Subpoenas, and that if he didn't, the Commission might choose to seek to enforce its subpoenas in court. A true and correct copy of that letter is attached as Exhibit 7.

17. The next day, July 2, 2009, Southwell called me to say that on July 6, 2009, Broidy would produce some—but not all—of his emails, and other required documents, as well as some of his actual bank account records. I also understood Southwell to say that by the end of the day on July 6, 2009, Broidy would provide a list reflecting the account identifying information for his bank and brokerage accounts, as called for in Request II(A)(6) of the June 2009 Subpoena. Finally, during that call, Southwell confirmed to me that both Gibson Dunn and Broidy interpreted the document subpoenas issued to Broidy personally as also requiring the production of documents belonging to Markstone. For this reason, Southwell said, I did not need to send a separate document subpoena to Markstone.

18. On July 6, 2009, I received a partial production of documents from Broidy, consisting mostly of financial records that were not directly called for by the May and June Subpoenas. However, a list of Broidy's bank and brokerage

accounts was not among the items provided that day. The following day, July 7, 2009, I sent Southwell an email expressing my concerns about Broidy's continuing document production problems. In his reply, Southwell claimed that they were "hard at work" trying to gather the required materials, but that Markstone was a "small organization that is struggling mightily" to respond to various regulatory inquiries. Southwell also disputed that he'd previously agreed to a fixed date for the list of Broidy's bank and brokerage accounts. A true and correct copy of that email chain is attached as Exhibit 8.

19. The next day, July 8, 2009, I again spoke with Southwell regarding the status of Broidy's document production. Southwell told me in that call that I'd receive more bank records shortly. Among other things, Southwell said that Broidy himself needed to review the list of bank and brokerage for accuracy and completeness, and that Broidy had departed for a vacation cruise in Alaska. Southwell said that Broidy was scheduled to return to Los Angeles on July 14, 2009, so I said that I would expect to receive the final bank and brokerage account chart no later than the close of business on July 15, 2009. Southwell then said that he was not sure if Broidy would be able to turn his attention to the account list immediately upon his return. I reminded him that Broidy received a subpoena for this information about six weeks ago. A true and correct copy of the email I sent to Southwell confirming this conversation is attached as Exhibit 9.

20. On July 9, July 16, and July 22, 2009, I spoke further with Southwell about document production issues and items that were missing or improperly produced. During this period, Southwell and I also exchanged several emails regarding similar issues. As of July 31, 2009, Broidy had produced documents in about 13 separate productions, varying from two to thousands of pages each. Some of the productions were spreadsheets of information that had to be revised one or more times. During each of those calls, I emphasized to Southwell the importance of promptly complying with the subpoenas, and he claimed that

documents were being produced as quickly as possible. Nonetheless, Broidy's document production remained substantially incomplete.

21. On July 9, 2009, I sent Southwell an email raising a number of concerns about the completeness of the documents that Broidy had already provided. A true and correct copy is attached as Exhibit 10.

22. On August 11, 2009, I sent Southwell another letter describing the sequence of prior events and reminding him that the Commission might seek to enforce its subpoenas in court. A true and correct copy is attached as Exhibit 11.

23. On August 12, 2009, both Southwell and Mindlin called me separately late in the day. They both told me that Broidy had rearranged the scope of his various lawyers' responsibilities so that a firm in Los Angeles (Michelman & Robinson, LLP) would play a more active role in gathering and reviewing documents. They asked for another extension until August 28, 2009 to produce the documents, but assured me that Broidy would fully comply by that date. I said I'd consider their request, and speak with them more the next day.

24. The next day, August 13, 2009, Catherine Brilliant, another Commission staff attorney assigned to this matter, and I had a conference call with Southwell, Mindlin, and Sanford Michelman (Broidy's fourth lawyer actively involved in this matter). During the call, Broidy's lawyers claimed that Broidy and Markstone had limited resources to respond to the subpoenas, but that Broidy was diligently trying to comply. I asked for details about the status of the production, such as what the overall volume of documents was expected to be; of that, what percentage had already been produced; who had collected the documents from Broidy for review; who exactly was reviewing the documents; what steps were being taken to prepare a log of documents withheld based on privilege; what document preservation steps were taken; and so on. After conferring privately several times, Broidy's three lawyers on the call declined to tell me who currently had possession of the documents subject to the subpoena; instead, they asserted

that the custodian's name was privileged information. I then told counsel that we would not agree to any more delay. I said that the staff of the Commission would consider and potentially move forward with a subpoena enforcement action in federal district court without any further notice to Broidy or his counsel. I sent an email confirming the conversation later that afternoon, and Southwell replied by email the next day. A true and correct copy of that email chain is attached as Exhibit 12. On August 17, 2009, Southwell sent a second response to my email. A true and correct copy is attached as Exhibit 13.

### The August 11, 2009 Document Subpoena to Markstone

25. On August 11, 2009, I issued a separate document subpoena to Markstone. A true and correct copy is attached as Exhibit 14. Documents called for by that subpoena were due on August 25, 2009. The same day I sent the subpoena, I confirmed to Southwell in writing that documents that had previously been sent to me by Broidy need not be re-produced by Markstone, and I encouraged Southwell to let me know if he had any questions. A true and correct copy is attached as Exhibit 15. I heard nothing further on the issue.

### The August 11, 2009 Testimony Subpoena to Broidy

26. On August 4, 2009, I send Southwell a message, saying that I planned to subpoena Broidy for testimony and asking him to suggest a convenient date in the last week of August or the first week in September 2009. A true and correct copy is attached as Exhibit 16. He did not reply.

27. On August 9, 2009, I sent Southwell an email repeating my request for potential testimony dates. A true and correct copy is attached as Exhibit 17. On August 10, 2009, Southwell responded by sending me a letter saying that "Broidy has other regulatory matters ... that require his immediate attention." Therefore, Southwell was unable to suggest a date for testimony. A true and correct copy is attached as Exhibit 17A.

28. On August 11, 2009, I issued a subpoena requiring Broidy to appear for sworn testimony in Los Angeles on September 1, 2009, at 9:30 a.m. ("August 2009 Subpoena"). A true and correct copy of that subpoena is attached as Exhibit 18.

29. Broidy's scheduled testimony was discussed with counsel during the conference call on August 13, 2009. At that time, Southwell expressed discomfort with having his client answer substantive questions in light of interest by other governmental agencies with criminal authority. I said that the Commission staff certainly respect Broidy's constitutional rights, and noted that in testimony, Broidy may either answer substantive questions or opt to assert his Fifth Amendment privilege against self-incrimination. I told counsel that, either way, we expected to see Broidy on September 1, 2009 in Los Angeles pursuant to the subpoena. I confirmed those statements in my follow-up email, a true and correct copy of which is attached above. In his both his August 13, 2009 and his August 17, 2009 replies, Southwell ignored the testimony issue.

30. On August 28, 2009, I sent Southwell an email which emphasized that my colleagues and I have no interest in interfering with Broidy's testimonial privileges in any way. I did remind him, however, that he had previously said that as a professional courtesy he would let me know Broidy's plans for testimony reasonably in advance. I then asked Southwell to let me know whether Broidy intended to answer questions or assert the Fifth Amendment. A true and correct copy of the email is attached as Exhibit 19.

31. A few minutes later, Southwell called me to say that Broidy would not appear at all. Southwell said that I would shortly receive a letter explaining Broidy's reasons for not appearing, but that Southwell wanted to make sure I got the message and did not spend the weekend preparing for a testimony that would not occur. I told Southwell that I was grateful for his courtesy. I also told Southwell, however, that Broidy's failure to appear for testimony was

1 | unacceptable; that the staff would feel free to pursue a subpoena enforcement
2 | action with any further notice to Broidy or his counsel; and that upon filing such an
3 | action, the otherwise non-public nature of the investigation becomes a matter of
4 | public record. Southwell told me that both he and his client understood.

5 |     32. A few hours later, I received a letter from Southwell saying that
6 | Broidy "will not be able to appear on September 1, 2009" because he is "diligently
7 | working towards completing the production of documents" which "requires
8 | appropriate attention." Broidy preferred not to have testimony proceed "in
9 | piecemeal fashion." Instead, Broidy proposed that he "aim to" complete his
10 | document production by September 14, 2009, and then appear for testimony
11 | sometime thereafter. A true and correct copy of the letter is attached as
12 | Exhibit 19A.

13 |     33. On September 3, 2009, Rosalind Tyson, the Regional Director of the
14 | Los Angeles Regional Office, contacted Southwell by telephone. I understand that
15 | she subsequently had several conversations with Fuchs, a Los-Angeles based
16 | attorney who works with Southwell, to explore whether they could agree to a date
17 | on which Broidy would appear for testimony. To the best of my knowledge,
18 | Tyson told Fuchs that Broidy needed to appear for testimony no later than
19 | September 17, 2009. I have been told that Fuchs responded to Tyson's offer to
20 | reschedule the testimony by asking Tyson to identify the specific topics and
21 | questions to be covered in Broidy's testimony, and that Tyson responded by giving
22 | him general guidance about our investigation. For example, I believe she told him
23 | that Broidy's testimony would likely cover the topics raised in the May and June
24 | 2009 Subpoenas issued to him in this matter months ago (as well as the topics
25 | raised in the August 2009 Subpoena to Markstone Capital Group) as well other
26 | issues related to investments by public pension funds.

27 |     34. I understand that Fuchs then asked Tyson whether the Commission
28 | staff would agree to restrict the scope of its inquiry purely to California, and that

10

Tyson declined to do so, citing the staff's long-standing policy not to agree to limit testimony questioning to particular factual questions or subjects.

35. I believe that Fuchs then proposed that Tyson agree to modify the subpoena to require Broidy to appear for testimony in Los Angeles on September 24, 2009, at 9:30 a.m. I am told that Fuchs also said that Broidy's "goal" was to complete his production of documents responsive to the May and June 2009 Subpoenas by "the end of the week of September 14, 2009." Tyson has told me that she and Fuchs agreed to this new schedule.

36. Shortly after September 8, 2009, Tyson gave an attorney assigned to this investigation a copy of a letter to her from Fuchs. That letter confirmed Broidy's September 24, 2009 testimony date and stated that "this schedule should enable document production ... to be completed prior to the testimony." A true and correct copy is attached as Exhibit 20.

37. On September 4, September 22, and September 23, 2009, Broidy produced additional documents to me. I have been unable to locate any log of privileged documents that have been withheld from his production, and I suspect that none has been prepared.

38. On September 18, 2009, Fuchs sent me a letter to "once again request clarification regarding the topics of [my] anticipated questioning." It appears from the letter and the cover email that Fuchs did not include Tyson on the September 18, 2009 correspondence. Regarding the overdue document productions, Fuchs stated in his letter that "out of consideration for the SEC," Broidy and his counsel had undertaken a process to "mitigate duplicate documents" but that the process "turned out to be more labor intensive than originally anticipated." Fuchs then wrote that he anticipates that some documents would be produced "next week" and a final document production "should be produced by the beginning of the following week." Finally, Fuchs disclosed that Broidy is "still in the midst of ongoing negotiations with the New York Attorney General's Office." As such,

Fuchs suggested that the Commission staff should not seek testimony from Broidy that may also relate to that New York investigation. A true and correct copy is attached as Exhibit 21.

39.  On September 21, 2009 (the following business day), I replied to Fuchs' letter. My email to Fuchs: (1) made it clear that I would neither provide Broidy with a detailed roadmap of prospective questions, nor agree to limit questioning to certain questions or subjects; (2) encouraged Fuchs to review the topics and general guidance provided by Tyson weeks ago; (3) explained that regardless of Broidy's involvement in other matters, the staff of the Commission has an independent statutory obligation to enforce the federal securities laws, and therefore will not agree to Fuchs' request to limit the scope of questions to Broidy because his answers might overlap with areas of interest to other government agencies; (4) underscored that the Commission staff always respects every witness' constitutional rights, including the Fifth Amendment privilege against self-incrimination; (5) reminded Fuchs that Broidy was expected to appear for testimony three days hence; and (6) noted that Broidy may also need to appear for one or more additional days of testimony later (particularly since he still has not completed his response to the document subpoenas issued to him over three months ago). A true and correct copy is attached as Exhibit 22.

40.  Yesterday, September 23, 2009, I sent Southwell a brief email asking him to explain what he could about Broidy's plans for the next day's testimony and how many lawyers would be attending, so I could prepare the appropriate number of copies of exhibits. In my email to Southwell, I explicitly wrote, "I have no desire to interfere with any of [Broidy's] privileges, of course, and rely on your professional judgment and courtesy in responding." A true and correct copy is attached as Exhibit 23.

41.  Several hours after my email to Southwell, Tyson let me know that Fuchs had called her to say that Broidy would not appear to testify on September

24, 2009, and he offered to stipulate that Broidy would come in for testimony during the week of October 19, 2009. I believe that in a subsequent call, Tyson told Fuchs that no further delay in testimony would be tolerated.

42. Later yesterday, Fuchs sent a letter to Tyson, Petillon, Sprung, and me. In it, he wrote that demanding Broidy's testimony now would be "fundamentally unfair and interfere with Mr. Broidy's constitutional rights." A true and correct copy is attached as Exhibit 24.

43. Today, at 9:30 a.m., in our offices in Los Angeles, a court reporter and a staff attorney were ready to proceed with Broidy's testimony. I understand the court reporter has executed a declaration regarding Broidy's non-appearance.

## Notice Pursuant to Local Rule 7-19.1

44. Pursuant to Local Rule 7-19.1, the staff gave notice of the Commission's Application to Broidy on Thursday, September 24, 2009. This notice was provided by telephone to Fuchs at approximately 12:15 p.m. In that call, the staff stated that the Commission planed file, on September 24, 2009, in the Central District of California, an *Ex Parte* Application for an Order to Show Cause and Application for an Order Compelling Compliance with Administrative Subpoenas issued to Broidy. Fuchs stated in a follow-up telephone call that Broidy opposes the Application. Later on September 24, 2009, Fuchs was notified by email that the Commission would file the application on September 25, 2009. We informed him that we proposed a hearing date for our Application, but the hearing date had not been scheduled by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 24, 2009, at Los Angeles, California.

_____
Leslie A. Hakala